FILED

2019 JUN -7 PM 4:01

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY:

Carl Mendlow, Pro per
4521 Live Ave.
Long Beach, CA 90807
949 375 9707

LACV 19 01771 (JFW-FFMx)

**United States District Court**

**Central District of California**

**Jury Trial Demanded**

Carl David Mendlow

v.

Keith Klein, Kiran Gollapudi, Health Net Medi-Cal,, Cedars-Sinai Medical Center, Peggy Miles, Joseph Thum, Olympia Health Care, LLC, dba Olympia Medical Center, Babak Bamshad, Mario Rosenberg, Dr. Michael Soffer, Beverly Hills Urgent Care, Dr. Nadereh Tafreshi-Darabi, Dr. Farag, Long Beach Hospital, Reddy Urgent Care, Children's Hospital, Medical providers in the Beverly Hills, Long Beach and Southern California region, Covered California

Amended Complaint

**Jurisdiction**

1.This case arises under the Constitution and laws of the United States. This court has jurisdiction under 28 USC 1331.

2. This case seeks redress for a combination or conspiracy in restraint of the provision of medical services in violation of the antitrust laws. This Court has jurisdiction under 15 U.S.C. Sec 1.

3. This case seeks redress for an abuse of monopoly power in violation of 15 USC Sec 2.

4. This case seeks redress for deprivations under color of law of rights privileges and immunities secured by the Constitution of the United States. This Court has jurisdiction under 28 USC 1343.

5. The plaintiff has been injured in his business and property by reason of violations of 18 USC 1962 (b), (c) and (d). This court has jurisdiction under 18 USC 1964.

ORIGINAL

**Introduction**

Plaintiff is alleging a group of doctors, medical providers and insurance providers combined and conspired to deny him access to an open and free market for medical care or health insurance coverage.

Plaintiff is alleging a supplier group boycott by a group of doctors in Southern California who:

1. Refuse to provide medical services to people who have previously been involved in medical malpractice disputes with health care providers or patients who refuse to agree to particular terms of service or who assert legal rights by not signing boilerplate legal forms before being treated. The doctors refuse to treat patients who, for example, do not sign agreements to waive mandatory arbitration clauses or waive the right to informed consent.

2. A. are engaging in an illegal group boycott to enforce a price fixing conspiracy.

B. are attempting to maintain prices at a level not diluted by having to provide lower cost services at state mandated Medi-Cal rates by refusing to treat Medi-Cal patients

3. exhibit a community wide hostility to the class of male patients and male health issues.

As a result of the boycott, has plaintiff suffered the kinds of injuries the antitrust laws were meant to prevent--that is poor quality care or no services at all during critical health crises; forced to agree to oppressive terms of service or be denied services, forced to pay higher prices for service; forced to pay cash for services that should have been covered or partially covered and forced to agree to be financially responsible for the gap between the full price doctors want to charge and the amount doctors receive from Medi-Cal.

Plaintiff is alleging antitrust injuries to the market for health care services that include: **PRICE, VOLUME OF SERVICES, ACCESS** and **QUALITY.** Plaintiff is also alleging hostility to male health issues in violation of discrimination laws on the basis of sex.

In particular, a group of Beverly Hills doctors refused to treat plaintiff for male health issues he sought treatment for from October 2014 until November of 2015. Then a group of Long Beach doctors similarly refused treatment for bronchitis in March 2018.

The following synopsis and facts provide support for the bolded elements of the charges alleged:

**Synopsis**

1. At first Cedar Sinai fraudulently induced plaintiff to be admitted with a false promise about obtaining insurance inside the hospital and then tried to turn him into a paying patient. - **PRICE**

2. The hospitals would not test or treat plaintiff's male urology complications—providing only rudimentary care and referring him to outside doctors. **QUALITY, HOSTILITY TO MALE HEALTH/REVERSE SEX DISCRIMINATION**

3. Outside doctors like Klein-the assigned primary care-- would not accept Medi-Cal insurance or would not treat Medi-Cal patients. He said that NO doctors in Beverly Hills would accept Medi-Cal.**PRICE, ACCESS, COMBINATION OR CONSPIRACY**

4. Other urologists would not take any insurance or very few specialized insurances. Plaintiff recollects calling 7-10 urologists in the first few months and finding no one who would treat him. Then Cedar Sinai

refused to perform imaging tests ordered by the one doctor who did agreed to take straight Medi-Cal sometime around Thanksgiving 2014.

**COMBINATION OR CONSPIRACY, VOLUME/ACCESS**

5. Doctors like Gollapudi, the referral from Cedar Sinai, refused to treat plaintiff unless he agreed to cover the gap out of his own pocket between the doctor's full charges and what they had agreed to take from Medi-Cal, waive his rights to informed consent and like many subsequent providers, he required plaintiff agree to mandatory arbitration. **PRICE, VOLUME/ACCESS-TERMS**

6. Health Net Medi-Cal made a series of referrals all of whom failed or refused to treat plaintiff from Dec 2014-July 2015. **ACCESS-VOLUME, ACCESS-TERMS, COMBINATION OR CONSPIRACY**

7. From Jan 2015-June 26, 2915 plaintiff was working in Sherman Oaks. Although he called just about every day, Medi-Cal failed to release plaintiff from Medi-Cal--a prerequisite to applying to Covered Cal. **QUALITY, ACCESS-VOLUME**

8. And when plaintiff sought to obtain better coverage through Covered Cal around July 8, 2015 they refused him coverage because he did not have current income. Plaintiff appealed and never got a response **QUALITY, ACCESS, PRICE.**

9. Then around Dec 1 2015, Covered Cal refused to process plaintiff's application for a $180-200 per month Silver 94 plan with Blue Cross/



Blue Shield unless he specifically agreed to waive his rights to jury trial in any medical malpractice case over covered care--if that was required by the insurer. Plaintiff checked and Blue Shield did not require mandatory arbitration but the State continued to demand he agree to the waiver statement--which he pointed out to the supervisors was vacuous as to Blue Cross/Blue Shield. They said plaintiff could always go out into the market and buy a full price plan.**QUALITY, ACCESS,  PRICE**

10. A subsequent group of hospitals and providers similarly refused treatment for bronchitis plaintiff sought treatment for in Long Beach, CA in March of 2018.
    **VOLUME-ACCESS**

11. During the critical period Feb 27-March 5 2018, Long Beach Hospital and Reddy Urgent Care of Bixby Knolls  again told plaintiff he would be a paying patient. They refused  to acknowledge the Medi-Cal insurance that had been approved by the Department of Social Services in late January-early February. Plaintiff provided documentation from the state to the providers and still they refused to acknowledge coverage, saying they could not see it in the computer system. **PRICE, VOLUME-ACCESS**

12. During the critical period Feb 27-March 5 2018, other private doctors turned plaintiff away saying they did not accept Medi-Cal just like had occurred in 2015.
    **VOLUME-ACCESS, PRICE**

13. During the critical period, Reddy Urgent Care in Long Beach refused to treat plaintiff because he would not agree to  mandatory arbitration. **ACCESS-TERMS**

14. The plaintiff finally remembered Beverly Hills Urgent Care was the one provider in the region that had given him care in 2015 so he took expensive Uber trips there from Long Beach.



15. On March 5 2018 and then again on March 20  2018, Beverly Hills Urgent Care proceeded to prescribe harmful medications that aggravated and recreated the high blood sugar condition and that threatened to recreate the renal toxicity and near kidney failure condition plaintiff had experienced in 2015. **QUALITY**

As a result of the boycott, plaintiff suffered and continues to suffer the following injuries the antitrust laws were meant to prevent:

DENIAL OF **ACCESS** TO RELEVANT MARKET OR **VOLUME** OF SERVICES OFFERED INADEQUATE TO SERVE CONSUMER NEED
Plaintiff was denied access to medical services in the relevant market. These doctors controlled and precluded plaintiff from access to an open market for medical services in the Los Angeles region in violation of the antitrust laws.

Plaintiff is alleging a supplier group boycott by a group of doctors in Southern California who refuse to provide medical services to people who have been involved in medical malpractice litigation or patients who assert legal rights by not signing boilerplate legal forms before being treated. For example- refusal to treat for not signing agreements to waive mandatory arbitration clauses or waive the right to informed consent.

**POOR QUALITY** RUDIMENTARY CARE OR POOR CARE
The hospitals would not test or treat plaintiff's male urology complications—providing only rudimentary care inside the hospital and/or by negligently and carelessly examining diagnosing testing or treating the plaintiff and then not referring to plaintiff to outside doctors or referring him



to outside doctors who refused to treat the plaintiff or started and abandoned treatment of the plaintiff.

**PRICE MAINTENANCE**

These doctors attempted to maintain prices for their services at a level not diminished by providing lower cost services at state mandated Medi-Cal rates by refusing to accept Medi-Cal patients.

These doctors sought to coerce plaintiff into becoming a cash paying patient in their efforts to undermine Medi-Cal, Obamacare and the goals of universal coverage.

**Statement of Facts**

1. Plaintiff incorporates by reference and realleges as if fully set forth herein the text of the following complaints:

    a. Carl David Mendlow v Cedar Sinai Medical Center, Dr. Peggy Miles, et. al. Complaint for Damages for Medical Malpractice (BG649360 May 3 2016 Sup Court of California County of Los Angeles)/(19STCV04876 Feb 14, 2019 Superior Court of California County of Los Angeles) 11pp.

    b. Carl David Mendlow v. Keith Klein, MD (Dec 8 2015 Pro per filing clerk) 5pp

2. In particular, plaintiff refers to the following text in the complaints referred to above:

**From the Cedar Sinai complaint**

    a. Synopsis para 10: "After relying on these representations and being admitted, the hospital employees reversed themselves and told plaintiff he would be required to pay for the stay as a paying patient." **PRICE**

    b. Synopsis para 11: "Defendant Klein exhibited malice by publishing a false and libelous report [in the Cedar Sinai system] ...that causes plaintiff to be shunned in the relevant medical community" **ACCESS-VOLUME**



c. Factual recitation para 5: " In a series of discussions plaintiff was  assured and promised that he would be able to obtain Medi-cal coverage for this visit from inside the hospital" **PRICE**

d.  Factual recitation para 8: " In the afternoon of Oct 17 Cedar Sinai reneged on their promises...and required plaintiff to pay ...as a paying patient." **PRICE**

e. Factual recitation para 11 '..failed to provide more than rudimentary care for the ...manifest urological problems" **QUALITY**

f. Factual recitation para 13 " ..did not do any thorough testing and treatment inside the hospital    when they had the power and ability to do so... and instead deferred treatment outside the hospital where as a Medi-Cal patient plaintiff was unable to obtain care" **QUALITY, ACCESS-VOLUME**

g. Factual recitation para 21: "Although plaintiff appeared at the appointed time to see Dr. Gollapudi, his staff refused to let plaintiff speak to the doctor unless plaintiff waived his rights to jury trial ...and sign language taking financial responsibility for any charges in excess of what Medi-Cal would pay. **ACCESS-TERMS**

h. Factual recitation para 24: "plaintiff incorporates and includes by reference the facts and legal complaints from the separate complaint herein against Dr. Klein for medical malpractice and libel." **QUALITY, ACCESS-VOLUME, ACCESS-TERMS, COMBINATION OR CONSPIRACY**

i. Factual recitation para 25: "Dr. Klein refused to treat the plaintiff and told plaintiff to tell Health Net Medi-Cal he was going to refuse to treat any more Medi-Cal patients." **QUALITY, ACCESS-VOLUME, COMBINATION OR CONSPIRACY**

j. Factual recitation para 27: " failed again to do any thorough diagnosis or further treatment of the urology problems inside the hospital..and instead deferred to treatments outside the hospital where as I told them I was unable to obtain care." **QUALITY, ACCESS-VOLUME**



k. Factual recitation para 28: " Olympia did not provide plaintiff with any referrals" **QUALITY, ACCESS-VOLUME**

l. Factual recitation para 30: " Olympia and its staff refused to treat the [male sexual injury] when plaintiff reported it to them on April 23 ....Olympia directed plaintiff to seek care from doctors outside the hospital." **MALE HEALTH, ACCESS-VOLUME**

m. Due Diligence recitation para 3: "From the onset of these injuries....seeking medical care many of these doctors....refused to accept Medi-Cal......strenuously attempting to get released from Medi-Cal so he could obtain coverage..that would be accepted by the physicians...unable to obtain health care coverage acceptable to the physicians, unable to find a primary care physician..." **ACCESS-VOLUME, PRICE**

n. Due Diligence recitation para 4: " Plaintiff tried dozens of times to get off Medi-Cal...Plaintiff could not obtain a release" **ACCESS-VOLUME**

o. Due Diligence recitation para 5: See **Synopsis**, supra, para 2-5.**QUALITY, HOSTILITY TO MALE HEALTH, PRICE, ACCESS-VOLUME, COMBINATION OR CONSPIRACY, ACCESS-TERMS**

p. Due Diligence recitation para 7: "During the periods of unemployment plaintiff could not obtain treatment as a Medi-Cal patient...did not qualify for Covered Ca..and could not afford to pay the doctors out of pocket ..as they sought to contractually force the plaintiff to agree to..." **PRICE**

**From the Keith Klein complaint**

a. Factual recitation para 12: Dr. Klein began questioning plaintiff -saying his record was red flagged because Cedars said plaintiff "would not sign our documents." **COMBINATION OR CONSPIRACY**

b. Factual recitation para 19: Defendant Klein then cut off the interview and said "I'm sick and tired of having to take Medi-Cal patients" **ACCESS-VOLUME, PRICE**



c. Factual recitation 20: Defendant Klein then said "Tell your insurance company that I'm a jerk and won't take any any more Medi-Cal patients..And see if you can find a doctor in Beverly Hills that will take Medi-cal..You can't." **PRICE, COMBINATION OR CONSPIRACY**

d. Factual recitation 22: "Defendant Klein then published an entry in plaintiff's medical record at Cedar Sinai..." **COMBINATION OR CONSPIRACY**

e. Libel para 7: "It was defendant Klein who said, "I'm sick and tired of having to take Medi-Cal patients" **PRICE, ACCESS**

f. Libel para 8: "It was defendant Klein who said, "Tell your insurance company I'm a jerk and won't take any more Medi-Cal patients'" And see if you can find a doctor in Beverly Hills that will take Medi-cal..You can't." **PRICE, COMBINATION OR CONSPIRACY**

g. Libel para 9a': "..subject the plaintiff to social, professional(and in this case medical) exclusion, aversion, contempt, ridicule, vilification, demonization, obloquy ..." **COMBINATION OR CONSPIRACY**

h. Libel para 9b: " effect of report is to demean degrade humiliate and dehumanize the plaintiff in the eyes of his colleagues in the Cedar Sinai medical system and anyone else who consumes, reads or becomes aware of the content of the published report" **COMBINATION OR CONSPIRACY**

i. Libel para 9c: " Those people who become aware of the content of the report will be induced to shun, avoid or mistreat the plaintiff..." **COMBINATION OR CONSPIRACY**

j. Libel para 11: As a proximate result of Klein's publication, plaintiff has been shunned in the relevant medical community and unable to obtain care for his critical urology and diabetes conditions..." **COMBINATION OR CONSPIRACY**

**FACTS SUPPORTING BOYCOTT OF REFUSAL TO AGREE TO TERMS**



1. Defendant Klein initiated the meeting with the plaintiff with the statement :"You've been red flagged in the Defendant Cedar-Sinai System". That statement alone involves at least two parties acting in concert:  Keith Klein and Cedar Sinai--not to mention anyone else contained in and implied by the word "system".

2. Keith Klein initiated the meeting with the plaintiff saying, "you won't sign OUR documents" . He did not say "You won't sign MY documents." The word "OUR" clearly implies a group of health care providers that require patients sign the referred to terms of service "documents."

3. The group of doctors complained about almost universally require prospective patients to agree to mandatory arbitration. Many of the doctors required patients to sign financial responsibility clauses or waivers of informed consent.  Covered Cal requires the class of all applicants as a precondition to obtaining any coverage to agree to waive their right to jury trial in any malpractice case arising out of covered services if required by the insurer--a blatantly unconstitutional condition on the receipt of a government benefit.

**FACTS SUPPORTING BOYCOTT OF PATIENT PREVIOUSLY IN DISPUTES WITH HEALTH CARE PROVIDER/ HISTORY OF SIMILAR DISPUTES**

Plaintiff incorporates by reference the section below entitled **Historical Facts.**

1. These facts support plaintiff's allegation that the medical providers are engaged in an antitrust conspiracy to boycott and refuse quality services to people that have been engaged in previous disputes with medical providers.



2. It is completely reasonable to suggest that discovery and further investigation could yield evidence that Southern California medical providers are aware of these disputes and were boycotting and/or providing low quality services to the plaintiff in retaliation, in furtherance of or even in competition with these previous disputes;

3. It is completely reasonable to suggest that discovery and further investigation could yield evidence that the Southern California medical providers are forcing plaintiff to sign onerous illegal terms to protect themselves from the risks of their own known and litigated misconduct.

4. When plaintiff got covered by Health Net, the first referral they steered him to was to a physician whose specialty is psychiatry. When plaintiff rejected this referral, Health Net assigned him to Keith Klein who immediately abused the appointment to write a psychological smear report in the Cedar Sinai system. So, plaintiff went to the doctors with a urology problem and the first thing Health Net and the doctors did after 17 years of no contact is set him up for a psychiatry battle.

5. These facts strongly suggests that discovery could easily produce evidence of an agreement or prearranged scheme in furtherance of the historical university medical system psychiatry coercion scheme that has been the subject of so much previous medical malpractice, civil rights and RICO litigation.

6. Defendant Keith Klein published a report in the Defendant Cedar-Sinai system. That fact alone involves two parties acting in concert to communicate a libel to the entire community of healthcare providers who have access to the report. That fact alone shows two parties combining to influence a larger group of providers to shun, mistreat and expose the plaintiff to further risk of harm if he seeks care from any member of the group.



4. **PRICE MAINTENANCE**

**FACTS SUPPORTING MEDI-CAL BOYCOTT; PRICE MAINTENANCE; PRICE FIXING**

1. Cedars fraudulently induced admission and then reneged and tried to force plaintiff to be a paying patient;

2. A. Gollapudi tried to get contractual agreement to cover the gap

   B. Gollapudi was referred by Cedars-Sinai suggesting that  discovery into their relationship and understanding could reasonably be expected to produce evidence of an agreement. Did Cedars have pre referral knowledge that outside referral would refuse to treat or put onerous conditions on treatment?

3. Defendant Klein said, "You won't find anyone in Beverly Hills who will take Medi-Cal". This statement sure seems to suggest further investigation could reasonably be expected to reveal an understanding among Beverly Hills physicians that they will not accept Medi-Cal patients.  Keith Klein knows his community of colleagues and their practices and policies better than plaintiff does and Dr. Klein has already basically admitted to the price maintenance allegation.

4.  Mario Rosenberg tried to charge for the gap; Mario persistently billed plaintiff and made collection calls to plaintiff for services that should have been covered by Medi- Cal right into the  summer of '16.

5. Many urologists plaintiff called wouldn't take any insurances or very little specialized insurances.

6. After plaintiff got off Medi-Cal to try and get Covered Cal insurance they might accept and was denied by Covered Cal,  the docs said, "we'll help you" [be a paying patient]. They thought plaintiff wanted to be a paying patient after plaintiff lost Medi-Cal and wasn't accepted by Obamacare;

7. Plaintiff ended up paying cash for Dr. Turek.



8. On information and belief talking to others similarly situated, and general widespread knowledge about the medical community's fierce resistance to Obamacare and universal coverage, there is good chance discovery will yield evidence of docs and medical providers trying to avoid responsibilities to treat Obamacare patients , Medi- Cal patients , the poor and game the new rules that were just taking effect at the time of these incidents. There is good chance discovery will yield evidence that doctors and health care providers are engaged in a conspiracy to subvert Obamacare, challenge universal coverage of the poor and coerce as many patients into becoming paying patients as possible.

**FACTS SUPPORTING ALLEGATION OF HOSTILITY TO MALE HEALTH/REVERSE DISCRIMINATION ON THE BASIS OF SEX**

1. a. An Olympia nurse predicted on the day plaintiff was released from Olympia and before plaintiff discovered the permanent male health injury that plaintiff will next suffer some kind of male menopause or loss of sexual prowess.

   b. Discovery is warranted to determine if this nurse has knowledge of a larger maybe familiar process by which this very blue very misandry laden community consciously encourages, causes or inflicts these kinds of injuries on men --Plaintiff seeks to depose this nurse to find what she knows about such a program or conspiracy expressing hostility to men, male sexuality and male health.

2. Both the prostate and blood pressure medications plaintiff was prescribed are both on Dr Turek's list of drugs that exacerbate and cause the male health condition. The first thing plaintiff tried was to get off those drugs to see if the condition improved. It did not.

4. Academy of Motion Pictures: On Feb 23, 2016 plaintiff attended a screening at the Samuel Goldwyn theater of the Motion Picture academy and was



shocked(given his recent discovery of the male health issue) when the screening

showed images of male castration. The emcee came out and said to the shocked

audience, "That's war" kicking off the election season culture wars. Plaintiff recalls

several screenings and shows at theaters and playhouses during this period in Los

Angeles were were laced with anti-father and anti male themes.

5. 3 years after these events,the Hollywood community launched the "Time's

Up" movement and the "Me too" prosecutions creating society wide hostility towards

all men that was felt in the media, workplaces, housing, restaurants and of course

the local entertainment industry.

6. The "Time's Up" movement reached its peak intensity 3 years after the

male health injury events events described in these pleadings.

7. Plaintiff recalls a similar situation in Connecticut in 2000-2001 when a "Lapse of

Time" statute was repeatedly invoked to evict plaintiff from housing on asserted

deadlines for filing and serving civil rights claims in NYC.

8. And in this case, the Beverly Hills landlord first noticed plaintiff to quit his Beverly

Hills apartment Sept 5, 2000 14 years to the day from when the Greenwich CT

landlords evicted plaintiff in 2000. The Beverly Hills eviction was actually

accomplished 1 year after the Turek diagnosis. Both legally significant date in the

underlying med mal RICO litigation. **See Housing Eviction Scheme, infra.**

9. Finally, on March 4 2018, at the Academy awards  ceremony, Jimmy Kimmel's

stated during his opening monologue:

"And most importantly of all Oscar has no penis He is literally a statue of

limitations."

3y and 65 days after the plaintiff was released at Olympia

10.  The Motion Picture Academy castration images and anti father themes, the

Hollywood initiated "Time's Up" movement and the community wide hostility to men



and male sexuality during this period of time coincident with plaintiff's suffering of male health injuries make it plausible that further discovery and investigation could be reasonably be expected to yield evidence of misconduct, illegal agreements and widespread group and community involvement in the alleged misconduct towards and negligent treatment of male health.

**Historical Facts Complex Civil Conspiracy Facts Plus Factors**

The following facts should make it eminently plausible that discovery will reveal evidence of illegal agreements, conscious commitment to common schemes and unity of purpose amongst the defendants in this case. Further investigation and discovery is warranted to discover further evidence that the current defendants acted in furtherance of multiple longstanding illegal schemes, combinations and conspiracies.

**Historical Facts**

1. In the Fall of 1987, plaintiff matriculated to Yale University as a graduate student in the mathematics department. Finding himself nearby, plaintiff began sitting in on classes at the Yale Law School and socializing at the Yale Law School as he had a lifelong interest in becoming a lawyer and had even visited the Law School in 1982 in anticipation of eventually applying.
2. In February 1988 and 1989, plaintiff applied to law schools and during 1988 was waitlisted at Yale Law. Plaintiff wrote an essay in some of his applications extolling the virtues of the Canadian universal health care system.
3. In August of 1988 plaintiff's grandmother had a stroke and died. 10 days later plaintiff's mother developed T-4 metastatic breast cancer.
4. From October 1988 until October 1990 the scientific and medical community and university administrations put enormous pressure on plaintiff to drop his plans to attend law school and remain in the scientific community. This pressure included, among other things:



Social and professional separation, isolation and veiled threats

Shadowing, harassment, bullying, hazing, computer hacking and the like

Seizure by the Yale Medical School

Suspension from University of Washington law school at the instigation of the

University of Washington Medical School and administration

5. In July of 1990 during the week of law review write on at the end of the first year, plaintiff's mother suffered a failed surgery at Mount Sinai in NYC leaving her a vegetable, on feeding tubes and morphine, until she died in March 1991 at Wightman nursing home, 1 mile from Tree of Life Synagogue in Pittsburgh, Pa.

6. During the 1990s, plaintiff sued the universities, medical schools, doctors, hospitals and Mount Sinai multiple times on behalf of his mother's estate and for the personal and career injuries inflicted on the plaintiff.

7. A combination of 2 further copycat medical defendants from Maryland and NYU copied the 1989 Yale kidnapping in 1995 and 2001. These facts became the subject of RICO, civil rights and medical malpractice litigation.

8. Plaintiff moved to Arizona and then to California, but the tortious conduct toward him continued to hound him in other guises-especially through the food and drug industry as well as further medical malpractice and continuing harassment by landlords.

9. For examples, plaintiff lost a 43k job in AZ due to food and drug torts, leaving him unemployed for 2 years in the mid 2000s and a 75 million net worth Orange County client died of leukemia treatments in July 2009, leaving plaintiff unemployed from the end of August 2009-Feb 2012.

10. One characteristic of these injuries is they uncannily seem to occur right at the cusp of a previous injuries purported time for legal action. In past writings and court filings, plaintiff has characterized this phenomena as the "continuity characteristic" or the "maintenance conspiracy."



11.  Plaintiff hypothesizes that the various medical, real estate, legal, pharmaceutical and insurance participants in this activity have been seeking to maintain control over the disputes, obtain jurisdiction over the disputes or act as a regulator of the disputes by continuing disputes with new injuries, many of them "copycat" injuries..

12. If needed, plaintiff can produce a list of over 30 such continuing tort incidents since law school, which includes what follow below.

13.  In light of this history it is not unreasonable to suggest that further discovery and investigation is warranted to determine if the current defendants were acting in furtherance of, in concert with, in jurisdictional competition with or in combination with these historical disputes.

**Complex civil litigation facts**

**Tort filing deadline punishment maintenance and control**

**Housing Eviction Scheme**

*Housing eviction facts in Beverly Hills 2016*

1.   On  May 3 2016, plaintiff returned home from presenting the Cedar Sinai medical malpractice claim (BG 649360 ) to the Superior Court clerk when he found a NOTICE TO QUIT his Beverly Hills apartment  had been shoved under the door. This apartment is located ½ block from the headquarters of the Motion Picture Academy and less than a mile from Cedars-Sinai.

2.  Plaintiff was re-served in July and prosecuted in Santa Monica Superior beginning Sept 16. A trial date was set for Nov 16 2016 and the plaintiff agreed to give up possession on Nov 18 2016 in open court.



*Medical malpractice litigation facts in Beverly Hills 2016*

    3.  Nov 16 2016 was 1 year to the day after Dr. Turek gave his diagnosis of the plaintiff's male health injury.

*Housing eviction facts in Long Beach late 2017*

    4. On Nov 12, 2017 plaintiff returned to the Long Beach area to serve a client after spending the previous year in Kansas City.

    5. Almost immediately the entire community became hostile and the plaintiff was harassed by the Long Beach landlord and by restaurants starting on Dec 4 2017; noticed to quit his Long Beach rental on Dec 8 2017 and fired from his Long Beach job on Dec 8, 2017. Plaintiff was then locked out of his Long Beach rental on Dec 13, 2017.

    6. Plaintiff retreated to an "Extended Stay" in Long Beach, where the community displayed even more hostility and fear mongering and plaintiff was subsequently evicted the night of Dec 31-Jan 1 2018.

*Medical litigation facts end of 2017*

    7. Dec 1, 2017 was approximately 2 years after Covered Cal denied plaintiff's application demanding he waive his 7th amendment rights.

    8. Dec 8, 2017 was 3 years to the day after the Keith Klein appointment.

    9. Dec 29 2017 is 3 years to the day plaintiff was released from Olympia Medical Center.

    *Judicially noticeable facts*

    10.  The "Time's Up" hysteria- the social political and economic war against men- especially in the Beverly Hills area entertainment industry-reached its peak intensity at around this same time - Dec 30 2017-Jan 2 2018--a critical point in the plaintiff's male health case.



***Continuing Medical Injury Feb 27 2018- March 20, 2018***

Facts

1. On Feb 27, 2018 Children's Hospital sponsored a free pancake day at IHOP.

2. Plaintiff ate a meal at IHOP that day.

3. Soon thereafter, plaintiff came down with a sore throat, inflammation of the throat, nostrils and deep persistent cough, labored and obstructed breathing, and other symptoms that were eventually diagnosed as bronchitis.

4. Plaintiff sought treatment at Reddy Urgent Care which refused to treat plaintiff unless he paid cash, stating that they could not see plaintiff's Medi-Cal coverage on their computer system. Plaintiff showed them written proof of coverage from the state which Reddy Care refused to accept. Then, when plaintiff offered to pay cash, the doctor in charge said he would not treat plaintiff unless he agreed to mandatory arbitration.

5. Plaintiff sought treatment at Long Beach Hospital. They told plaintiff they could not see his coverage and simulating Cedars in 2014 said he would be a paying patient on March 1 2018.

6. Plaintiff sought treatment with a number of referrals--none of whom would accept Medi-Cal or treat the plaintiff.

7. Finally plaintiff remembered Beverly Hills Urgent Care-the one clinic in the region that had treated him in 2015. He took expensive Uber trips to Beverly Hills to see them.

8. Plaintiff went to the Urgent Care twice in March of 2018 seeking treatment for bronchitis on March 5 and then for eye blepharitis on March 20.

9. As a repeat visitor, plaintiff is known to be diabetic by Beverly Hills Urgent Care

9. Plaintiff suffered a major case of urinary tract infection, urinary retention, and diabetes with renal complications in 2014-2015--a situation which plaintiff first presented to the clinic in Oct 2014 before being transferred to Cedar Sinai.



10. During both visits  in March 2018 clinic doctors prescribed medications which aggravated my known conditions.

11. On March 5, 2018 Dr. Darabi prescribed a  steroid called "solumetrol" which spiked plaintiff blood sugars to dangerous levels.

12. And on March 20, 2018, Dr. Farag prescribed another steroid "prednisol" which similarly spiked plaintiff's blood sugar to dangerous levels .

13. Then, after asking about my kidney history, Dr. Farag  prescribed "Valtrex"--which is known to cause renal toxicity, injury or failure in patients with previous kidney condition.

14.  She said she was just covering the slim possibility that shingles was the cause of the blepharitis. The pharmacies were all simultaneously pushing shingles testing and treatment at the same time.

**Urology-Catheter-Pneumonia-Bronchitis Facts**

Sometime approximately in 1966-1967, plaintiff experienced the following two medical events:

1.     A. He  was kicked in the back and was hospitalized at Children's Hospital in Pittsburgh, PA with urological/kidney issues.

B.  A catheter was poorly placed causing extreme pain and blood in the urine.

2. Plaintiff came down with pneumonia was hospitalized at St. Clair Hospital under an oxygen tank and missed a significant amount of first grade.

Now from 2014-2018, the following two medical events occured:

1.  A. Plaintiff could not urinate went to Beverly Hills Urgent Care And Cedar Sinai was and diagnosed with urinary retention and UTI.

B. A catheter was poorly placed causing extreme pain for seven weeks.

C. Plaintiff was given a drug called AZO which caused a copper red cloud in his urine bag-simulating blood in the urine.



D. Plaintiff was released from Olympia and discovered permanent injuries to his male reproductive system

2. 3 years and 60d later plaintiff developed bronchitis after eating a free meal sponsored by Children's Hospital.

**Facts suggesting discovery could reasonably be expected to yield evidence of widespread misconduct in the medical and pharmaceutical industries**

1. Steroids spiking blood sugars prescribed to known diabetic.

2. Blood sugar spiking because of with pharmaceuticals in Beverly Hills in 2018 case suggests discovery might lead to evidence that other medical conditions experienced  may have been induced by toxic substances or pharmaceuticals

3. Drug (Valtrex) with known kidney complications prescribed to patients with kidney disease history; related urological malpractice and patient abandonment case

4. Whether Food products or toxic substances, drugs, additives, bacteria, pathogens, poisons, caused gastrointestinal distress and IBD in Arizona from 2002 until 2008 resulting in 2 years of unemployment and job loss

5. Suspicious death of employer after Leukemia blood transfusions at Hoag Hospital in Orange County in July 2009 resulting in 2 years of unemployment

6. Whether Reproductive toxins are involved in causing injuries to male reproductive system

7. Whether toxic substances or food products involved in onset of diabetes

8  Whether elderly medications possibly cause stroke or early death

9.  Surgical spinal malpractice causing death of mother

10. Coercion to take psychiatric drugs causing 30 year loss of legal career

11. Failure to timely treat breast cancer complications

12. AZO causing copper colored urine

13. Whether food products were involved in seasickness case.



14. Blood pressure and drugs that aggravate or cause male health condition

**Discovery required of what information is in my historical medical record and discovery of whether that information is being abused to harass plaintiff or to copy, repeat or recreate further medical injuries**

**Causes of Action**

**For a violation of 15 USC Sec 1**

Defendant doctors and health care providers and insurers Keith Klein, Kiran Gollapudi,... et. al. and others still yet unknown did enter into a combination or conspiracy to restrain access to an open market for medical services, to reduce output and the Volume of services offered to the community and to maintain prices at inflated levels undiminished by having to serve Medi-Cal or other low price consumers in Los Angeles County in violation of 15 USC Sec 1. As a result plaintiff suffered higher prices than he could afford as a Medi-Cal recipient, plaintiff suffered from poor quality care and plaintiff was denied access to care by a healthcare supplier boycott.

**For a violation of 15 USC Sec 2**

Defendant doctors and health care providers and insurers Keith Klein, Kiran Gollapudi,... et. al. and others as yet unknown did abuse monopoly power and control over the market for health care services in the relevant market by refusing to deal with plaintiff in violation of 15 USC Sec 2. As a result plaintiff suffered from no care or poor quality care, prices he could not afford as a Medi-Cal recipient and plaintiff was denied access to care by a health care supplier boycott.

Wherefore, plaintiff seeks damages as specified below:



1. Money damages

2. Punitive damages

3. Attorney's Fees

4. Injunctive Relief

5. Such other relief as is just

**For Causes of Action for medical malpractice, negligence and civil conspiracy to abuse pharmaceuticals and toxic substance to continue a series of injuries and aggravate known conditions.**

## Medical malpractice and/or Medical malpractice conspiracy

**Duty**

The Beverly Hills Urgent Care clinic doctors have a sworn and primary duty to the plaintiff to "first do no harm";

The clinic doctors have a duty to prescribe appropriate treatments narrowly tailored to treat the medical condition presented and diagnosed.

The Clinic has a duty to know enough about the plaintiff's medical history to ensure that their treatments do not aggravate known conditions

**Breach**

Clinic doctors displayed an obvious want of due care and negligence in prescribing the harmful medications Solumetrol, Prednisol and Valtrex which aggravated and recreated the urological and diabetes conditions plaintiff first brought to the attention of the clinic and the Beverly Hills medical community in 2014-2015.

The doctors breached their duty to do no harm by causing and threatening harm.

Dr. Farag breached her duty to prescribe narrowly tailored appropriate treatments by prescribing the Valtrex to cover a possible cause of the eye blepharitis that she admitted was highly unlikely when the known risk of harm from the Valtrex to a kidney patient outweighed its potential benefit to treat a low possibility cause.

Knowing the plaintiff had previously suffered near kidney failure in 2014 and even asking the plaintiff about previous kidney history Dr. Farag went ahead and carelessly prescribed the Valtrex anyways

**Proximate cause**

As a proximate result of these careless prescriptions displaying a want of due care

**Damages**

The drugs Solumetrol, Prednisol caused harm to plaintiff's diabetic condition and the drug Valtrex threatened to cause severe harm to plaintiff's urological system.

**Civil conspiracy**

In March 2018, The Beverly Hills Urgent Care and its doctors Darabi and Farag combined and conspired with the 2014-2015 defendants to:

1. Recreate and aggravate known urological and diabetic conditions

In March 2018, Reddy Urgent Care and Long Beach Hospital and other providers combined and conspired with the 2014-2015 defendants to:
1. Deny plaintiff access to critically needed health care services without
   a. Requiring plaintiff agree to be a paying patient despite being covered by Medi-Cal
   b. Requiring plaintiff to sign onerous terms like mandatory arbitration



These events took place -3 years and 60 days after the 2014 injuries -- a critical inflection point in the malpractice litigation v Cedar Sinai, et. al., continuing a series of medical negligence incidents that occured in 2014-15 and which resulted in permanent injuries to plaintiff's male reproductive and urological systems.

(Carl David Mendlow v Cedar Sinai Medical Center, Dr. Peggy Miles, et. al. Complaint for Damages for Medical Malpractice (BG649360 May 3 2016 Sup Court of California County of Los Angeles)/(19STCV04876 Feb 14, 2019 Superior Court of California County of Los Angeles) 11pp. Carl David Mendlow v. Keith Klein, MD (Dec 8 2015 Pro per filing clerk) 5pp

**Additional Discovery requested**

Plaintiff Requests presuit discovery to determine if there is additional claims for toxic torts, food and drug tampering, negligence, breach of warranty and/or products liability.

Carl Mendlow, plaintiff pro per

4221 Lime Avenue

Long Beach CA 90807

949-375-9707



[illegible handwritten name and address]

## Superior Court of California

## County of Los Angeles

BC649330 (Sup Ct of Cal May 3 2016)

Carl David Mendlow, plaintiff

No. 19STCV04876 (Sup Ct of Cal Feb 14 2019)

vs.

COMPLAINT FOR DAMAGES FOR MEDICAL MALPRACTICE

Cedar Sinai Medical Center, Dr. Peggy Miles,

Dr. Keith Klein, Dr. Kiran Gollapudi, Dr. Joseph Thum,

Olympia Medical Center, Dr. Mario Rosenberg,

Dr. Babak Bamshad, Dr. Michael Soffer , Employees,

Nurses at Cedar Sinai Medical and Olympia Medical

Center

UNLIMITED CIVIL CASE

Plaintiff alleges:

Jurisdiction, Residence and Venue:

1. The Superior Court of California is the court of general jurisdiction in the County of Los Angeles. This complaint seeks money damages for torts committed in the County of Los Angeles.
2. The plaintiff resides at 144 N La Peer Dr Beverly Hills, CA in the County of Los Angeles
3. The defendant hospitals are located in the County of Los Angeles. The defendant doctors, staff and hospital employees practice medicine or are employees in the County of Los Angeles.
4. Jurisdiction and venue lie in the County of Los Angeles.

**Synopsis**

[illegible signature]

5.   From October-December 2014 plaintiff presented himself to defendant doctors and medical practitioners complaining of severe pain, urinary retention, nausea and vomiting.

6.   Defendant doctors discovered plaintiff was suffering from diabetes as well.

7.   During the course of several hospitalizations and physician visits  the defendant doctors, hospitals and medical practitioners:

   a.  Failed to perform a proper urological physical examination

   b.  Failed to perform proper urological tests

   c.  Negligently or carelessly inserted a catheter in plaintiff

   d.  Negligently, carelessly or intentionally abandoned or refused treatment of the plaintiff leaving the painful catheter in place for over 7 weeks.

   e.  Subjected plaintiff to rudimentary incomplete treatments below the standard of care

   f.  Undertreated plaintiffs urology condition

   g.  Abandoned treatment of the plaintiff

   h.  Refused treatment of the plaintiff

   i.  Aggressively treated plaintiff for conditions he did not have

   j.  Failed to render a proper urological diagnosis

   k.  Failed to discover and treat retrograde ejaculation

   l.  Otherwise negligently, carelessly examined, diagnosed, tested and treated plaintiffs urology condition.

   m.  Failed to exercise that degree of skill and care commonly required of medical practitioners nurses technicians assistants and health care facilities in treating urology conditions.

8.   As a result of defendants' negligence, omissions or intentional refusal to treat the plaintiff, plaintiff developed and was unable to obtain treatment for a condition known as retrograde ejaculation.

9.   As a result of negligence and omissions of defendants plaintiff has sustained and continues to sustain the following injuries damages and losses:

   a.  Injury to his male reproductive system

   b.  Retrograde ejaculation; Loss of the ability to consummate the fundamental act of procreation and sexual expression

   c.  Humiliation, embarrassment

   d.  Loss of the enjoyment of life

   e.  Medical expenses

   f.  Future medical expenses

Wherefore plaintiff seeks general damages, punitive damages and such other relief as is just.

10.  Defendant Cedar Sinai hospital employees committed fraud by inducing reliance that plaintiff could apply for and receive Medi- Cal inside the hospital for his initial visit Oct 16-17. After relying on these representations and being admitted, the hospital employees reversed themselves and told plaintiff he would be required to pay for the stay as a paying patient. Plaintiff was forced to leave the hospital and obtain the Medical insurance outside the hospital—thereby causing plaintiff to suffer further nausea, vomiting, diarrhea and injuries to his urological system and increasing the risk of further harm from his critical conditions.

11.  Defendant Klein exhibited malice by publishing a false and libelous report—described in the libel portion of the complaint-- that causes plaintiff to be shunned in the relevant medical community.

Because the defendants were not only negligent in their care but practiced fraud and exhibited malicious hostility toward the plaintiff, plaintiff seeks punitive damages.

**Factual Recitation**

1.  On October 16, plaintiff presented to Cedar Sinai complaining of extreme pain in his lower abdomen and inability to urinate.

2.  Cedar Sinai diagnosed the plaintiff as having urinary retention and urinary tract infection, inserted a Foley catheter in plaintiff and emptied plaintiff's bladder

3.  Cedar Sinai discovered plaintiff had extremely high blood sugars and recommended plaintiff be admitted for further testing and treatment.

4.  Plaintiff informed Cedar Sinai that he did not have insurance and had been unemployed for most of the previous year.

5.  In a series of discussions plaintiff was assured and promised that he would be able to obtain Medi-Cal coverage for this visit from inside the hospital . These promises were made to the plaintiff in front of doctor witnesses.

6. Relying on these promises plaintiff was admitted on October 16, 2014.

7. After testing the next day plaintiff was diagnosed and treated for diabetes and urinary tract infection during the course of October 16-17.

8. In the afternoon of Oct 17 Cedar Sinai reneged on their promises and representations and refused to take plaintiffs application for Medi-Cal—and required plaintiff to pay for the hospitalization and treatment as a paying patient.

9. Plaintiff left the hospital in order to obtain health care coverage.

10. Plaintiff obtained Medi-Cal coverage and returned the hospital on October 30.

11. Although the hospital and doctors treated the diabetes and the UTI, the hospital and doctors failed to provide any more than rudimentary care for the obvious and manifest urological problems.

12. Despite asking every day numerous times to see a urologist, the urologist, defendant Thum only appeared once for a few minutes at the end of the stay.

13. The doctors and hospital did not do any thorough testing diagnosis and treatment of the urology problems inside the hospital when they had the power and ability to do so and instead deferred treatments outside the hospital where as a Medi-Cal patient plaintiff was unable to obtain care.

14. Instead of placing the plaintiff in the diabetes or urology unit, the hospital put plaintiff in the heart unit and tested the plaintiff extensively for a heart condition that did not exist.

15. Defendants took blood samples numerous times a day—sometimes appearing every hour or two to draw more blood.

16. No one ever communicated to plaintiff or informed plaintiff of any risks of injuries to his reproductive system from his condition or treatment.

17. Cedar Sinai employed an inexperienced neophyte nurse to insert a poorly manufactured Foley catheter on or about Nov 4 which caused ongoing pain for the next 7 weeks.

18. When plaintiff returned the Cedar Sinai on or about Nov 15 –and complained about the painful catheter —the doctor said, "well of course it hurts –you have a foreign object inside of you".

19. It was not until a staff member at Olympia Medical Center removed the painful catheter and replaced it with a better quality catheter in a professional manner that the pain subsided on or about Dec 22.

20. Plaintiff was released from Cedar Sinai on Nov 5 2014 and given an appointment to see defendant Gollapudi.

21. Although plaintiff appeared at the appointed time to see Dr. Gollapudi, his staff refused to let plaintiff speak to the doctor unless plaintiff waive his right to informed consent, waive his hts to jury trial in the case of a dispute and sign language taking financial responsibility for any charges in excess of what Medi-Cal would pay.
22. Plaintiff sought treatment from numerous other urologists and primary care physicians who would either not accept Medi-Cal or required plaintiff to take responsibility for paying for all costs in excess of Medi-Cal and/or or waive his rights to jury trial and informed consent as a prerequisite to obtaining care.
23. In particular, plaintiff sought care from Keith Klein who was assigned by Health Net Medi-Cal as his primary care physician. Plaintiff obtained an appointment to see Klein on Dec 8 2014.
24. Plaintiff incorporates and includes by reference the facts and legal complaints from the separate complaint found herein against Dr,. Klein for medical malpractice and libel.
25. Dr. Klein refused to treat the plaintiff and told plaintiff to tell Health Net he was going to refuse to treat any more Medi- Cal patients.
26. Finally after experiencing more pain nausea and vomiting plaintiff was admitted to Olympia Medical center on Dec 22 again complaining of urinary tract infection, urinary retention diabetes, nausea vomiting and painful catheterization.
27. Although Olympia and its doctors did a good job at replacing the painful catheter, controlling the nausea and vomiting, treating the diabetes and successfully performing a voiding trial, Olympia and its doctors failed again to do any thorough testing , diagnosis or further treatment if the urology problems inside the hospital when they had the power and ability to do so and instead deferred to treatments outside the hospital where as I told them, I was unable to obtain care.

28. Olympia did not provide plaintiff with any referrals when he was released on Dec 27 2015

29. None of the doctors at Olympia ever communicated to me the risks of injuries to my reproductive system from my condition or treatment.

30. Olympia and its staff refused to treat the retrograde ejaculation  when plaintiff reported it to them during a visit to Olympia on April 23, 2015. Olympia directed plaintiff to seek care from doctors outside the hospital.

31.  Plaintiff finally found Dr Paul Turek an expert in male health issues who examined tested and diagnosed plaintiff on Nov 16, 2015.

**CAUSES OF ACTION**

**FOR A CAUSE OF ACTION FOR MEDICAL MALPRACTICE**

**Failure to test, diagnose and treat for medical conditions**

**Patient abandonment**

**Refusal to treat**

**Failure to communicate**

**Failure to warn**

**Duty**

1. Physicians have a duty to perform appropriate urological tests and examinations and to treat medical conditions such as plaintiff's urinary tract infection, urinary retention diabetes and diabetes complications.
2. Physicians have a duty to communicate to patients the risks and benefits of various courses of action in treating conditions such as plaintiff's urinary tract infection, urinary retention, diabetes and diabetes complications.
3. Cedar Sinai and its employees have a duty when inserting a Foley catheter to use the highest degree of skill and care and highest quality catheter.
4. Dr. Klein, as plaintiffs assigned primary care provider, has a duty to refer patients to other doctors and specialists who are able to treat the plaintiff's urinary tract infection, urinary retention, diabetes and diabetes complications.

**Breach**

1. Cedar Sinai, Dr Miles and her medical group and staff breached the duty to test and treat plaintiffs urology conditions when they failed to do any thorough testing diagnosis or treatment of the urology problems apart from placing a Foley catheter inside plaintiff and conducting a voiding trial. They deferred any more extensive treatment of plaintiff's urology problems to an outside group of urologists and primary care physicians who all refused or failed to treat the plaintiff outside the hospital.
2. Cedar Sinai, Dr. Miles, Dr. Gollapudi Dr Klein Olympia Medical Center and Dr. Rosenburg breached their duty to communicate by failing to communicate to the plaintiff of any risk of injuries to plaintiff's reproductive system from plaintiff's condition or treatments.
3. Olympia Medical Center and its medical staff failed to treat plaintiff's retrograde ejaculation when plaintiff reported it to them during a visit on April 23, 2015. They told him to obtain care from an outside urologist.
4. Cedar Sinai and its staff breached the duty use the highest degree of skill and care when they Cedar Sinai employed an inexperienced neophyte nurse to insert a poorly

manufactured Foley catheter on or about Nov 4 which caused incredible pain for the next 7 weeks.

5. Dr. Gollapudi and his staff breached the duty to test, diagnose and treat the plaintiff when his staff refused to let plaintiff speak to the doctor unless plaintiff waive his right to informed consent, waive his rights to jury trial in the case of a dispute and sign language taking financial responsibility for any charges in excess of what Medi-Cal would pay.

**Proximate cause**

By delaying, failing and refusing to treat plaintiffs urology condition defendant doctors, hospitals and staff significantly increased the risk of harm to the plaintiffs urological system and harm occurred within the scope of the risk created by the defendants.

As a result of defendants' negligence, omissions or intentional refusal to treat the plaintiff, plaintiff developed and was unable to obtain treatment for a condition known as retrograde ejaculation.

**Damages**

As a result of negligence and omissions of defendants plaintiff has sustained and continues to sustain the following injuries damages and losses:

a. Injury to his male reproductive system
b. Retrograde ejaculation; Loss of the ability to consummate the fundamental act of procreation and male sexual expression
c. Humiliation, embarrassment
d. Loss of the enjoyment of life
e. Medical expenses
f. Future medical expenses

Wherefore plaintiff seeks general damages, punitive damages and such other relief as is just.

**Discovery, Actual Notice, Due Diligence and Tolling**

1. Plaintiff did not discover both the fact of the retrograde ejaculation and its negligent cause until after February 3, 2015

2. Plaintiff served notice of his intent to sue the following defendants by mail within 90 days of the 1 year anniversary of discovering the fact of the retrograde ejaculation: Cedar Sinai Medical Center, Dr. Peggy Miles, Dr. Joseph Thum, Dr. Kiran Gollapudi, Dr. Keith Klein.

3. From the onset of these medical injuries and throughout the calendar year 2015, plaintiff exercised due diligence in seeking to discover the cause of his medical injuries by
   - seeking medical care from doctors, hospitals and specialists. Many of these doctors and specialists –especially defendant Keith Klein-- who was assigned by Health Net Medi-Cal as plaintiff's primary care physician refused to accept Medi-Cal insurance or treat Medi-Cal patients. This included the doctors who had treated him at Olympia who he sought care from when he got out in January.
   - strenuously attempting to get released from Medi-Cal so he could obtain coverage under a Covered Cal plan that would be accepted by the physicians.
   - Pleading with over 40 medical malpractice law firms to represent him and assist him in the investigation and discovery of the legal cause of his medical injuries.

Despite exercising aforesaid due diligence and despite these strenuous efforts plaintiff was unable to obtain health care coverage acceptable to the physicians, unable to find a primary care physician and unable to find a lawyer to investigate and discover the legal cause of his injuries.

4. Plaintiff tried dozens of times to get off Medi-Cal and onto Covered Cal while he was employed from Jan 5-June 26 2015. Plaintiff could not obtain a release from Medi-Cal during that period of his employment

5. The hospitals would not test or treat plaintiff's urology complications—providing only rudimentary care and referring him to outside doctors. Outside doctors like Klein-the assigned primary care-- would not accept Medi-Cal insurance or would not treat Medi-Cal patients. Doctors like Gollapudi refused to treat plaintiff unless he agreed to cover the gap out of his own pocket between the doctor's full charges and what they had agreed to take from Medi-Cal.

6. Plaintiff lost his job on June 26 2015 and was unemployed in July, September November and December of 2015.  Plaintiff did not start working full time again until Feb 2016 and did not start receiving paychecks until the end of Feb 2016.  Plaintiff suffered economic duress during these periods and was unable to discover the cause of or obtain treatment for his medical injuries.

7. During the periods of unemployment plaintiff  could not obtain treatment as a Medi-Cal patient because most of the doctors did not accept Medi-Cal, did not qualify for a Covered Cal plan because he did not have the requisite income and could not afford to pay the doctors out of pocket for their services as they sought to contractually force the plaintiff to agree to.

8. From July 2014 through March of 2015, plaintiff was under continuous pressure to vacate his apartment and under threat of eviction. In particular plaintiff had been told to quit his apartment by February 1 2015.

9. In addition to adjusting to and attempting to understand the nature of his medical conditions and seeking and being refused medical care for those conditions- plaintiff had to spend what precious little resources and time he had looking for and securing housing during the first 3 months after he was hospitalized.

10. Plaintiff also had to start a new full time job on Jan 5 2016 just days after being released from Olympia.

11. All of these factors contributed to the duress plaintiff was acting under in January- April of 2015 that made it extremely difficult if not impossible to discover the nature and cause of his medical conditions.


Addendum:

12. On May 3, 2016 plaintiff tendered this complaint to the Superior Court in Los Angeles County.  A case number BC649360 and  judge were assigned but plaintiff suspended the filing because despite exercising aforesaid due diligence, plaintiff had been unable to find a primary care physician, had been unable to obtain health care coverage acceptable to the physicians, was unsure of the medical cause of his medical injuries and was unable to find a lawyer to investigate and discover the legal cause of his injuries.

13.   Plaintiff finally found Dr. Paul Turek, a men's health and fertility urologist  who diagnosed and treated plaintiff for the retrograde ejaculation on Nov 16, 2015. Plaintiff  paid Dr Turek cash.

14.   Plaintiff continued to and continues to request dozens of attorneys to investigate this case and help him discover the legal cause of his injuries and prosecute appropriate claims. They continue to refuse representation.

15.   On Nov 9, 2018 plaintiff resent by CERTIFIED MAIL CCP 364-365 notices to Dr. Kiran Gollapudi, Dr Keith Klein, Dr Joseph Thum, Cedar Sinai Medical Center, Dr Babak Bamshad, Dr. Peggy Miles, Dr. Michael Soffer, Dr. Mario Rosenberg and Olympia Medical Center.

16. On Feb 14, 2019 plaintiff filed in Superior Court of California Case # 19STCV04876--the complaint herein.

Carl Mendlow, pro per

4221 Lime Avenue

Long Beach, CA 90807

562-336-0939

949 375 ... Carl Mendlow pro per
562 336 0931 4221 Lime Avenue
Long Beach, CA 90807

LA CV 19 01771
JFW - FFMX

# Superior Court of California

# County of Los Angeles

Carl David Mendlow, plaintiff

vs.

Keith Klein, M.D.

No. _____________

AMENDED COMPLAINT FOR DAMAGES FOR MEDICAL MALPRACTICE AND LIBEL

UNLIMITED CIVIL CASE

Plaintiff alleges:

Jurisdiction, Residence and Venue:

1. The Superior Court of California is the court of general jurisdiction in the County of Los Angeles. This complaint seeks money damages for torts committed in the County of Los Angeles.
2. The plaintiff resides at 144 N La Peer Dr Beverly Hills, CA in the County of Los Angeles
3. The defendant's place of business is at 99 N La Cienega Beverly Hills,CA. The events occurred at defendant's previous office address at 8900 Wilshire Avenue in the County of Los Angeles.
4. Jurisdiction and venue lie in the County of Los Angeles.

Factual Recitation

5. On December 8, 2014 plaintiff appeared at a 4:00pm appointment with defendant Klein.
6. Dr. Klein had been assigned as plaintiff's primary care physician by Health Net Medical.
7. Plaintiff had been suffering from urological problems, diabetes and diabetes complications since first visiting the ER at Cedar Sinai on Oct 16, 2014.
8. Plaintiff required immediate care for the urinary tract infection, urinary retention , diabetes and painful catheterization he had been suffering for the previous 7.5 weeks.
9. Dr. Klein did not appear for the appointment until 6:30pm.
10. Plaintiff joyfully greeted Dr. Klein with, "So you're my primary care physician."
11. Dr. Klein give the stiff response, " We'll see about that."
12. Dr. Klein began questioning plaintiff –saying his record was red flagged because Cedars said plaintiff "would not sign our documents."
13. Dr. Klein questioned plaintiff's state issued picture ID.
14. Plaintiff gently steered Dr. Klein away from these irrelevant questions and requested that Dr. Klein focus on listening to plaintiff's medical history.

15. Plaintiff barely got started reciting the history of his urology and diabetes problems starting with the visit to the ER on Oct 16, when defendant Klein snapped and interrupted plaintiff and said, "I don't have to listen to this shit."
16. Klein barked, "get to the point"
17. Klein refused to listen to plaintiff's careful, simple, calm, thoughtful low key and well spoken description of his medical history.
18. Instead Klein immediately became abusive, irritated, hostile, impatient, peremptory and rude.
19. Defendant Klein then cut off the interview and said "I'm sick and tired of having to take Medi-Cal patients."
20. Defendant Klein then said "Tell your insurance company that I'm a jerk and won't take any more Medi -Cal patients." "And see if you can find a doctor in Beverly Hills that will take Medi-Cal ..you can't."
21. Defendant Klein then chased plaintiff out of his office.
22. Defendant Klein then published an entry in plaintiffs medical record at Cedar Sinai which libeled and defamed plaintiff in that:

a. The entry published by Klein falsely reported plaintiff as "angry, labile, inappropriate", and "aggressive". It falsely reported plaintiff displaying "impulsivity" and making" threatening gestures" and
b. The entry published by Klein maliciously diagnosed the plaintiff as having "severe oppositional defiant disorder with angry or irritable mood" and "aggressive behavior of adult."
c. The entry published by Klein falsely reports that plaintiff insisted on discoursing about legal theories and made accusations about various employees of Cedar-Sinai.

**CAUSES OF ACTION**

**FOR A CAUSE OF ACTION FOR MEDICAL MALPRACTICE**

**Failure to take a medical history, test, treat or refer medical conditions**

1. Dr. Klein has a duty to take a careful medical history, to test and to treat medical conditions such as plaintiff's urinary tract infection, urinary retention or diabetes and diabetes complications.

2. Dr. Klein has a duty to communicate the risks and benefits of various courses of action in treating the patients urinary tract infection, urinary retention or diabetes and diabetes complications.



3. Dr. Klein has a duty to refer patients to other doctors and specialists who are able to treat the plaintiff's urinary tract infection, urinary retention or diabetes and diabetes complications.

4. Klein breached these duties in that:

a. Klein peremptorily cut off the plaintiff off and refused to take a medical history.
b. Klein did no testing of plaintiff's urinary tract infection, urinary retention or diabetes and diabetes complications.
c. Klein failed to treat plaintiffs urinary tract infection, urinary retention or diabetes and diabetes complications.
d. Klein failed to communicate the risks and benefits of various courses of action in treating the patients urinary tract infection, urinary retention or diabetes and diabetes complications.
e. Klein failed to refer plaintiff to physicians or specialists who were able to treat plaintiff's urinary tract infection, urinary retention or diabetes and diabetes complications.

5. As a result of Dr. Klein's refusal to take a history, test, treat or refer the plaintiff, plaintiff continued to experience pain, nausea and further hospitalization for his diabetes and urology problems.
6. As a result of Dr. Klein's refusal to treat plaintiff's urological problems and diabetes complications or communicate the risks or benefits of certain courses of action plaintiff has suffered serious injuries to his male reproductive system which continue to this day.
7. Plaintiff has suffered injuries to his reproductive system, pain, humiliation, mortification and hurt all to his damage.
8. Defendant Klein acted with malice in publishing the false report and demeaning psychological diagnoses.

9. Wherefore plaintiff seeks general damages, punitive damages and such other relief as is just.

**FOR A CAUSE OF ACTION FOR LIBEL**

1. The report published by defendant Klein in the Cedar-Sinai medical system is a complete fabrication and a falsehood.
2. Throughout the encounter of Dec 8, 2014, plaintiff was peaceful, calm, thoughtful, low key, soft spoken and appropriately seeking treatment for real medical conditions.
3. Instead of listening to plaintiff's careful, simple, soft spoken description of the history of plaintiff's diabetes and urology problems, it was defendant Klein who became immediately abusive, irritated, hostile, impatient, peremptory rude and inappropriate.
4. It was defendant Klein who opened with  "We'll see about that" when plaintiff welcomed him as his primary care physician.
5. It was defendant Klein who launched into an attack challenging plaintiff about irrelevant legal issues about whether plaintiff had previously had agreed to sign or not or not sign consent language during previous visits to Cedar-Sinai. It was the plaintiff that patiently steered Klein into listening to a recitation of the plaintiffs present medical condition.
6. It was defendant Klein who cut plaintiff off after just a few minutes of plaintiffs careful soft spoken recitation of his medical history with "I don't have to listen to this sh** "
7. It was defendant Klein who "I'm sick and tired of having to take Medi-Cal patients."
8. It was defendant Klein who said, "Tell your insurance company that I'm a jerk and won't take any more Medi -Cal patients." "And see if you can find a doctor in Beverly Hills that will take Medi-Cal ..you can't".
9. The labels ascribed to plaintiff in paragraph 22 are libelous on their face.
   a. Written statements impugning someone's mental health are considered libel per se. The sole purpose and effect of such psychological labeling is to subject the plaintiff to  social, professional(and in this case medical) exclusion, aversion, contempt, ridicule, vilification, demonization and obloquy.
   b. The  effect of defendants Kleins libelous report is to demean, degrade, humiliate and dehumanize the plaintiff in the eyes of his colleagues in the Cedar Sinai medical system and anyone else  who  consumes, reads or becomes aware of the content of his published report.
   c. Those people who become aware of the content of the report will be induced to shun, avoid or mistreat the plaintiff. One obvious result is that plaintiff is unable to obtain unbiased quality medical care by anyone affiliated with the Cedar Sinai medical system who becomes aware of the report.
10. Defendant Klein acted with malice in publishing the false report and demeaning psychological diagnoses.

11. As a proximate result of  Kleins publication, plaintiff has been shunned in the relevant medical community and unable to obtain care for his critical urology and diabetes

conditions. Plaintiff has suffered injuries to his reproductive system, pain, humiliation, mortification and hurt all to his damage.

12. Wherefore plaintiff seeks general damages, punitive damages and such other relief as is just.

Carl Mendlow, pro se

144 N La Peer Dr #3

Beverly Hills, CA 90211

Plaintiff tendered the complaint to the pro per filing desk on Dec 8, 2015.

Exhibit A

Original Fact Exhibits presented to clerk Dec 18 2018 452 - withdrawn so can apply to SEAL

Statement of Facts

**Factual Recitation About Appointment with Dr Keith Klein UCLA nephrology professor Dec 8 2014**

1. On December 8, 2014 plaintiff appeared at a 4:00 pm appointment with defendant Klein.
2. Dr. Klein had been assigned as plaintiff's primary care physician by Health Net Medical.
3. Plaintiff had been suffering from urological problems, diabetes and diabetes complications since first visiting the ER at Cedar Sinai on Oct 16, 2014.
4. Plaintiff required immediate care for the urinary tract infection, urinary retention , diabetes and painful catheterization he had been suffering for the previous 7.5 weeks.
5. Dr. Klein did not appear for the appointment until 6:30pm.
6. Plaintiff joyfully greeted Dr. Klein with, "So you're my primary care physician."
7. Dr. Klein give the stiff response, " We'll see about that."
8. Dr. Klein began questioning plaintiff –saying his record was red flagged because Cedars said plaintiff "would not sign our documents."
9. Dr. Klein questioned plaintiff's state issued picture ID.
10. Plaintiff gently steered Dr. Klein away from these irrelevant questions and requested that Dr. Klein focus on listening to plaintiff's medical history.
11. Plaintiff barely got started reciting the history of his urology and diabetes problems starting with the visit to the ER on Oct 16, when defendant Klein snapped and interrupted plaintiff and said, "I don't have to listen to this shit."
12. Klein barked, "get to the point"
13. Klein refused to listen to plaintiff's careful, simple, calm, thoughtful low key and well spoken description of his medical history.
14. Instead Klein immediately became abusive, irritated, hostile, impatient, peremptory and rude.
15. Defendant Klein then cut off the interview and said "I'm sick and tired of having to take Medi-Cal patients."
16. Defendant Klein then said "Tell your insurance company that I'm a jerk and won't take any more Medi -Cal patients." "And see if you can find a doctor in Beverly Hills that will take Medi-Cal ..you can't."
17. Defendant Klein then chased plaintiff out of his office.
18. Defendant Klein then <u>published</u> an entry in plaintiffs medical record at Cedar Sinai which libeled and defamed plaintiff in that:

   a. The entry published by Klein falsely reported plaintiff as "angry, labile, inappropriate", and "aggressive". It falsely reported plaintiff displaying "impulsivity" and making" threatening gestures" and

b. The entry published by Klein maliciously diagnosed the plaintiff as having "severe oppositional defiant disorder with angry or irritable mood" and "aggressive behavior of adult."

c. The entry published by Klein falsely reports that plaintiff insisted on discoursing about legal theories and made accusations about various employees of Cedar-Sinai.

**CAUSE OF ACTION FOR LIBEL Presented to Superior Court Pro Per Clerk on Dec 8 2015.**

1. The report published by defendant Klein in the Cedar-Sinai medical system is a complete fabrication and a falsehood.
2. Throughout the encounter of Dec 8, 2014, plaintiff was peaceful, calm, thoughtful, low key, soft spoken and appropriately seeking treatment for real medical conditions.
3. Instead of listening to plaintiff's careful, simple, soft spoken description of the history of plaintiff's diabetes and urology problems, it was defendant Klein who became immediately abusive, irritated, hostile, impatient, peremptory rude and inappropriate.
4. It was defendant Klein who opened with "We'll see about that" when plaintiff welcomed him as his primary care physician.
5. It was defendant Klein who launched into an attack challenging plaintiff about irrelevant legal issues about whether plaintiff had previously had agreed to sign or not or not sign consent language during previous visits to Cedar-Sinai. It was the plaintiff that patiently steered Klein into listening to a recitation of the plaintiffs present medical condition.
6. It was defendant Klein who cut plaintiff off after just a few minutes of plaintiffs careful soft spoken recitation of his medical history with "I don't have to listen to this sh** "
7. It was defendant Klein who "I'm sick and tired of having to take Medi-Cal patients."
8. It was defendant Klein who said, "Tell your insurance company that I'm a jerk and won't take any more Medi -Cal patients." "And see if you can find a doctor in Beverly Hills that will take Medi-Cal ..you can't".
9. The labels ascribed to plaintiff in paragraph 22 are libelous on their face.

   a. Written statements impugning someone's mental health are considered libel per se. The sole purpose and effect of such psychological labeling is to subject the plaintiff to

social, professional(and in this case medical) exclusion, aversion, contempt, ridicule, vilification, demonization and obloquy.

b. The effect of defendants Kleins libelous report is to demean, degrade, humiliate and dehumanize the plaintiff in the eyes of his colleagues in the Cedar Sinai medical system and anyone else who consumes, reads or becomes aware of the content of his published report.

c. Those people who become aware of the content of the report will be induced to shun, avoid or mistreat the plaintiff. One obvious result is that plaintiff is unable to obtain unbiased quality medical care by anyone affiliated with the Cedar Sinai medical system who becomes aware of the report.

10. Defendant Klein acted with malice in publishing the false report and demeaning psychological diagnoses.

11. As a proximate result of Kleins publication, plaintiff has been shunned in the relevant medical community and unable to obtain care for his critical urology and diabetes conditions.

**Factual Recitation about treatment at Cedar Sinai Presented to Superior Court Clerk of Los Angeles County on May 3 2016 and on Feb 14 2019 Subsequent Refusals of Doctors outside the hospital to treat plaintiff's male urological issues.**

1. On October 16, 2014 plaintiff presented to Cedar Sinai complaining of extreme pain in his lower abdomen an inability to urinate.

2. Cedar Sinai diagnosed the plaintiff as having urinary retention and urinary tract infection, inserted a Foley catheter in plaintiff and emptied plaintiff's bladder

3. Cedar Sinai discovered plaintiff had extremely high blood sugars and recommended plaintiff be admitted for further testing and treatment.

4. Plaintiff informed Cedar Sinai that he did not have insurance and had been unemployed for most of the previous year.

5. In a series of discussions plaintiff was assured and promised that he would be able to obtain Medi-Cal coverage for this visit from inside the hospital . These promises were made to the plaintiff in front of doctor witnesses.

6. Relying on these promises plaintiff was admitted on October 16, 2014.

7. After testing the next day plaintiff was diagnosed and treated for diabetes and urinary tract infection during the course of October 16-17.

8. In the afternoon of Oct 17 Cedar Sinai reneged on their promises and representations and refused to take plaintiff's application for Medi-Cal—and required plaintiff to pay for the hospitalization and treatment as a paying patient.

9. Plaintiff left the hospital in order to obtain health care coverage.

10. Plaintiff obtained Medi-Cal coverage and returned the hospital on October 30.

11. Although the hospital and doctors treated the diabetes and the UTI, the hospital and doctors failed to provide any more than rudimentary care for the obvious and manifest urological problems.

12. Despite asking every day numerous times to see a urologist, the urologist, defendant Thum only appeared once for a few minutes at the end of the stay.

13. The doctors and hospital did not do any thorough testing diagnosis and treatment of the urology problems inside the hospital when they had the power and ability to do so and instead deferred treatments outside the hospital where as a Medi-Cal patient plaintiff was unable to obtain care.

14. Instead of placing the plaintiff in the diabetes or urology unit, the hospital put plaintiff in the heart unit and tested the plaintiff extensively for a heart condition that did not exist.

15. Defendants took blood samples numerous times a day—sometimes appearing every hour or two to draw more blood.

16. No one ever communicated to plaintiff or informed plaintiff of any risks of injuries to his reproductive system from his condition or treatment.



17. Cedar Sinai employed an inexperienced neophyte nurse to insert a poorly manufactured Foley catheter on or about Nov 4 which caused ongoing pain for the next 7 weeks.

18. When plaintiff returned the Cedar Sinai on or about Nov 15 –and complained about the painful catheter —the doctor said, "well of course it hurts –you have a foreign object inside of you".

19. It was not until a staff member at Olympia Medical Center removed the painful catheter and replaced it with a better quality catheter in a professional manner that the pain subsided on or about Dec 22.

20. Plaintiff was released from Cedar Sinai on Nov 5 2014 and given an appointment to see defendant Gollapudi.

21. Although plaintiff appeared at the appointed time to see Dr. Gollapudi, his staff refused to let plaintiff speak to the doctor unless plaintiff waive his right to informed consent, waive his hts to jury trial in the case of a dispute and sign language taking financial responsibility for any charges in excess of what Medi-Cal would pay.

22. Plaintiff sought treatment from numerous other urologists and primary care physicians who would either not accept Medi-Cal or required plaintiff to take responsibility for paying for all costs in excess of Medi-Cal and/or or waive his rights to jury trial and informed consent as a prerequisite to obtaining care.

23. In particular, plaintiff sought care from Keith Klein who was assigned by Health Net Medi-Cal as his primary care physician. Plaintiff obtained an appointment to see Klein on Dec 8 2014.
24. Plaintiff incorporates and includes by reference the facts and legal complaints from the separate complaint found herein against Dr,. Klein for medical malpractice and libel.

25. Dr. Klein refused to treat the plaintiff and told plaintiff to tell Health Net he was going to refuse to treat any more Medi- Cal patients.

26. Finally after experiencing more pain nausea and vomiting plaintiff was admitted to Olympia Medical center on Dec 22 again complaining of urinary tract infection, urinary retention diabetes, nausea vomiting and painful catheterization.

27. Although Olympia and its doctors did a good job at replacing the painful catheter, controlling the nausea and vomiting, treating the diabetes and successfully performing a voiding trial, Olympia and its doctors failed again to do any thorough testing , diagnosis or further treatment if the urology problems inside the hospital when they had the power and ability to do so and instead deferred to treatments outside the hospital where as I told them, I was unable to obtain care.

28. Olympia did not provide plaintiff with any referrals when he was released on Dec 27 2015

29. None of the doctors at Olympia ever communicated to me the risks of injuries to my reproductive system from my condition or treatment.

30. Finally, Olympia and its staff refused to treat the male health issues when plaintiff reported it to them during a visit to Olympia on April 23, 2015. Olympia directed plaintiff to seek care from doctors outside the hospital.

31. Plaintiff continued to seek treatment from Health Net referrals and from the doctors he had met at Olympia from Jan 2015 until November of 2015.

32. No doctors could be found who would agree to treat plaintiff as his primary care or to treat his male health conditions until plaintiff found Dr Paul Turek and was diagnosed and treated by him from Nov 10-16, 2015.

33. As was true throughout, the doctors outside the hospital either refused to take Medi-Cal or required plaintiff to sign oppressive agreements to waive jury trial rights, pay the gap or give up rights to informed consent.

34. The doctors inside the hospital provided rudimentary care and were unable or unwilling to treat the male health complications presented to them.

